IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COLLEEN M. SAXTON, | ) |
| | ) |
| | ) CIVIL ACTION NO. _____ |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) |
| | ) |
| REDSTONE PRESBYTERIAN | ) |
| SENIORCARE t/d/b/a | ) |
| REDSTONE HIGHLANDS, | ) JURY TRIAL DEMANDED |
| | ) |
| DEFENDANT. | ) |

## COMPLAINT

### INTRODUCTION

1. This action is brought under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12131 *et seq.* ("ADA"), the Pennsylvania Human Relations Act, 43 P.S. §§ 955 *et seq.* ("PHRA"), and Pennsylvania common law. Plaintiff alleges that the defendant discriminated against her her because of her disability and her workers' compensation claim.

### JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1367.

3. This Court has federal question jurisdiction because plaintiff's claims under the ADA arise from a federal statute. 28 U.S.C. § 1331.

4. This Court has supplemental jurisdiction over plaintiff's state law claims

under 28 U.S.C. § 1367.

5. This Court has personal jurisdiction over the defendant because its contacts with Pennsylvania and this federal judicial district meet the requirements necessary to satisfy the notions of fair play and justice established in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945).

6. Venue is proper under 28 U.S.C. § 1391 because the defendant resides in, and the plaintiff's claims arise from events which occurred in, this judicial district.

7. The plaintiff mailed a timely, signed intake questionnaire and continuation page to the Pittsburgh office of the Equal Employment Opportunity Commission ("EEOC"). Upon receipt of the questionnaire, the EEOC prepared a charge of discrimination and forwarded it to the plaintiff. The plaintiff signed and forwarded the charge to the EEOC requesting that it be dual-filed with the Pennsylvania Human Relations Commission. The EEOC served the charge on the defendant. The defendant submitted a position statement in response to the charge.

8. On April 16, 2018, the EEOC forwarded the plaintiff a 90-day Notice of Right to Sue. This complaint is filed within 90 days from her receipt of that notice.

9. More than one year has elapsed from the dual-filing of the plaintiff's PHRA complaint.

10. The plaintiff has properly exhausted her federal and state administrative remedies.

## PARTIES

11. The previous paragraphs are incorporated.

12. Plaintiff Colleen M. Saxton ("Ms. Saxton") is an adult citizen and resident of Pennsylvania with an address at 311 Fosterville Road, Greensburg, Westmoreland County, Pennsylvania 15601.

13. Defendant Redstone Presbyterian SeniorCare, t/d/b/a Redstone Highlands ("Redstone"), is a Pennsylvania non-profit corporation with an office at 126 Matthews Street, Suite 2800, Greensburg, Westmoreland County, Pennsylvania 15601.

14. Redstone's website at http://redstonehighlands.org indicates that it is a senior living community with several locations in Westmoreland County.

15. At all times relevant to this complaint, Redstone was Ms. Saxton's "employer" under the ADA and PHRA and employed more than fifteen (15) employees.

## FACTUAL BACKGROUND

16. The previous paragraphs are incorporated.

17. Ms. Saxton is 44 years old. She is a Greensburg native. She graduated from Hempfield High School in 1992. In 2000, she graduated from the University of Pittsburgh. In 2006, she obtained an associate degree in nursing from Westmoreland Community College. She is a registered nurse in good standing.

18. Ms. Saxton's previous employers in the medical field include IHS of Greater Pittsburgh.

19. Prior to her employment by Redstone, she was never terminated from

employment.

20.     On or about October 11, 2006, Redstone hired Ms. Saxton as a weekend charge nurse at its Greensburg Facility at 6 Garden Center Drive, Route 66 North, Greensburg.  Her first day of work was October 16, 2006.

21.     In 2013, Ms. Saxton was diagnosed with stage 3 breast cancer.  Over the ensuing two years, she underwent chemotherapy, radiation, and surgery.  She continued to work at Redstone, taking periodic FMLA leaves for cancer surgeries in 2013 and 2015.

22.     On February 20, 2016, Ms. Saxton fell while at work, injuring her left shoulder and neck.  She treated at MedExpress in Jeannette and was given an arm sling to wear.  She informed her health care providers that her fall was caused by chemotherapy-induced peripheral neuropathy in her feet.

23.     She filed a timely workers' compensation claim and remained off work until March 8, 2016.

24.     Prior to Ms. Saxton returning to work, she was interrogated by Megan Henson, Redstone's administrator.  Ms. Henson ordered her to reenact her fall.  While doing so, Ms. Saxton explained that the peripheral neuropathy in her feet from her chemotherapy contributed to her fall.  Before this, Ms. Saxton had not informed Redstone of this complication.

25.     During Ms. Henson's interrogation, she asked Ms. Saxton, "Is this (peripheral neuropathy) going to be an ongoing problem?"  Ms. Henson questioned her about her family's history of cancer.  Ms. Saxton related that her aunt was undergoing treatment for colon cancer, her sister suffered from thyroid cancer, and her maternal

grandparents died of cancer in their late 40's.  Ms. Henson asked her if she planned to have breast reconstruction.  Ms. Saxton replied that she intended to have double breast reconstruction when her skin burns from radiation therapy completely healed.

26. From the date of hiring on October 11, 2006, to her fall on February 20, 2016, Ms. Saxton had an outstanding work record.  She was never disciplined, and she had received only positive evaluations.  She was the recipient of consistent praise and merit pay raises for performing her duties above and beyond the minimum requirements of her job.

27. By contrast, after Ms. Saxton's return to work on March 8, 2016, Redstone's treatment of her underwent a sea change.  Shortly after she returned to work in March, Redstone significantly increased her medical cart duties and admissions.  She asked Vicky Loucks, Redstone's vice president of quality assurance, if she could have assistance from nurses as was customary; Ms. Loucks said no.  Subsequently, Beth Kohler, Redstone's director of nursing, told her, "I looked in your employee file and noticed that you have never been disciplined, isn't that interesting?"  Meghan Henson, the administrator who interrogated her about her cancer, told her that, if she asked for assistance, she would be disciplined.  During a meeting in late March, Ms. Loucks remarked, "And look at you Colleen, you're a cost to us."  Before this, Ms. Saxton had never heard of any employee being demeaned as a "cost."

28. From April to July 2016, Ms. Saxton continued to be saddled with additional duties and was hyper-scrutinized.  Ms. Loucks repeatedly told her, "You are a cost to us."

29. In one meeting, Ms. Henson asked her, "How are you doing? When are you going to have breast reconstruction?" Ms. Saxton replied, "My skin isn't ready yet." Ms. Loucks interjected, "You're a cost to us." Ms. Saxton complained to Ms. Henson that she was being unfairly targeted. Ms. Henson failed to investigate her complaints as required by Redstone's harassment policy.

30. On July 25, 2016, Ms. Henson told Ms. Saxton that she needed to conduct a disciplinary meeting with her, alleging that she had improperly blocked an admission on July 23. Ms. Saxton vehemently denied that she did anything wrong, stating that, in fact, she had e-mails which exonerated her. Ms. Henson replied that, unbeknownst to Ms. Saxton, Ms. Loucks had used her administrator's e-mail access code to delete those e-mails from Ms. Saxton's account. Ms. Saxton felt that Redstone was trying to force her to quit because she was a "cost" to the company, as Ms. Loucks had often remarked since her fall in February.

31. By August 2016, Ms. Saxton felt immense pressure from being overworked and hyper-scrutinized. She sought advice from Geoff Ghering, the administrator/director of Redstone's "Senior Independence," which is a related company located in Redstone's annex building. Mr. Ghering was not in his office so she spoke with his office manager, Carol Wallace. Ms. Saxton told her that that she was being forced out and that she needed to speak with Mr. Ghering for advice when he returned.

32. During the weekend of August 13, 2016, Ms. Saxton sought the advice of Dr. Joseph Gall, one of Redstone's physicians. She told him that Ms. Kohler, Ms. Loucks, and Ms. Henson were targeting her and trying to force her to quit. Dr. Gall

assured her that she was a good nurse and should not be concerned.

33. On August 17, 2016, Ms. Kohler called Ms. Saxton while she was on vacation. Ms. Kohler told her that she was prohibited from entering the Redstone building until she attended a meeting. Ms. Saxton asked her about the subject of the meeting. Ms. Kohler replied, "I can't tell you. I will give you a date for it." Ms. Saxton called Ms. Loucks. She complained that she was being unfairly targeted and that Redstone had not investigated her harassment complaint. Ms. Kohler called her, leaving a cell phone message which instructed her to attend a meeting on August 23, 2016; no reason was given.

34. On August 23, 2016, Ms. Saxton met with Ms. Henson and Ms. Kohler in Ms. Henson's office. They accused her of submitting two fraudulent "green sheets" (paper time sheets). They called her a thief, ordered her to turn in her badge, and summarily fired her. She was not allowed to defend herself or examine the time sheets which she had supposedly falsified.

35. Ms. Saxton denies that she falsified her time sheets. At that time, Redstone had recurring problems with its new digital time keeping system, so it was not uncommon to experience discrepancies. Paper time sheets were used to rectify those issues. In cases involving other employees, time sheet discrepancies were discussed by the employees and supervisors, then resolved without incident. Ms. Saxton was not given an opportunity to explain the alleged falsification because Redstone used it as a pretext to terminate her.

36. When Ms. Saxton was employed by Redstone, she earned $43 per hour plus

overtime and excellent benefits.  Her annual compensation ranged from $80,000 to $90,000 per year.  Her one-way commute was approximately 15 minutes in light traffic.

37.     After Ms. Saxton was fired, she sought work with other employers.  She obtained a part-time position at Latrobe Health and Rehabilitation.  She subsequently obtained a full- time position with Community Life in Wilkinsburg, where she now works.  Her annual compensation and benefits are substantially less than her compensation at Redstone.  Her one-way commute is approximately 60 minutes in rush hour traffic.

## COUNT I – ADA –HOSTILE WORK ENVIRONMENT

38.     The previous paragraphs are incorporated.

39.     Redstone is Ms. Saxton's "employer" under the ADA because, during the relevant time period, it employed 15 or more employees who worked each work day in 20 or more calendar weeks.

40.     The ADA defines "disability" with respect to an individual: (a) a physical or mental impairment that substantially limits one or more major life activities of such individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment.

41.     Ms. Saxton was "disabled" within the meaning of the ADA due to her cancer-related peripheral neuropathy which restricted her major life activities which included, but were not limited to, standing, walking, and working.

42.     In the event this court determines that Ms. Saxton was not "disabled" under

the ADA during the relevant time periods, then she pleads in the alternative that she has a record of such an impairment and/or Redstone regards her as having such an impairment.

43. Ms. Saxton was a "qualified individual with a disability" because she was qualified for her position and could have performed her essential job functions with or without a reasonable accommodation.

44. The ADA prohibits employers from discriminating against an employee because she is disabled or made a good faith complaint of disability discrimination.

45. From on or about February 20 to August 23, 2016, Redstone subjected Ms. Saxton to hostile work environment because of her disability and/or perceived disability and/or her complaints that she was being targeted because of her disability and/or perceived disability.

46. The hostile work environment which Ms. Saxton was subjected to was severe or pervasive enough to have created a work environment that a reasonable person in her position would have considered intimidating, hostile, or abusive.

47. As a result of Redstone's unlawful actions, Ms. Saxton suffered damages which include, but are not limited to, emotional distress, humiliation, embarrassment, inconvenience, and loss of life's pleasures.

48. Redstone's actions were willful, wanton, and outrageous which justify an award of punitive damages.

**WHEREFORE,** Ms. Saxton respectfully requests judgment against Redstone in an amount that will compensate her for her injuries and damages resulting from

Redstone's violation of her rights under the ADA, and award damages for severe emotional distress, pain and suffering, embarrassment, humiliation, damage to personal and professional reputation, court costs, expense of litigation, expert witness fees, punitive damages, reasonable attorney's fees and costs for this legal action and defense of her unjustified and bad faith unemployment compensation claim opposition, prejudgment interest, as well as any other further legal and equitable relief this Court deems just and appropriate under the ADA.

## COUNT II – ADA –WRONGFUL DISCHARGE

49. The previous paragraphs are incorporated.

50. Redstone unlawfully discharged Ms. Saxton because she was disabled and/or regarded as disabled and/or had a record of being disabled.

51. As a result of Redstone's unlawful actions, Ms. Saxton suffered damages which include, but are not limited to, loss of back and front pay, loss of earnings potential, loss of career opportunities, loss of future earnings, lost benefits past and future, damage to her personal and professional reputation, emotional distress, humiliation, embarrassment, inconvenience, and loss of life's pleasures.

52. Redstone's actions are willful, wanton, and outrageous which justify an award of punitive damages.

**WHEREFORE,** Ms. Saxton respectfully requests judgment against Redstone in an amount that will compensate her for her injuries and damages resulting from

Redstone's violation of her rights under the ADA, and award her reinstatement, back pay and, if appropriate, front pay, lost wages, past and future, loss of future earnings and earnings capacity, loss of career opportunities, loss of employee benefits, past and future, severe emotional distress, pain and suffering, embarrassment, humiliation, damage to personal and professional reputation, court costs, expense of litigation, expert witness fees, punitive damages, reasonable attorney's fees for this legal action and defense of her unemployment compensation claim, prejudgment interest, as well as any other further legal and equitable relief this Court deems just and appropriate under the ADA.

## COUNT III – ADA - RETALIATION

53. The previous paragraphs are incorporated.

54. Ms. Saxton participated in protected activity under the ADA when she complained that she was being targeted after she returned to work from her work-related injury on February 20, 2016.

55. Redstone took adverse action against Ms. Saxton when it harassed her and then unlawfully discharged her on August 23, 2016.

56. As a result of Redstone's unlawful actions, Ms. Saxton suffered damages which include, but are not limited to, loss of back and front pay, loss of earnings potential, loss of career opportunities, loss of future earnings, lost benefits past and future, damage to her personal and professional reputation, emotional distress, humiliation, embarrassment, inconvenience, and loss of life's pleasures.

57.	Redstone's actions are willful, wanton, and outrageous which justify an award of punitive damages.

**WHEREFORE,** Ms. Saxton respectfully requests judgment against Redstone in an amount that will compensate her for her injuries and damages resulting from Redstone's violation of her rights under the ADA, and award her reinstatement, back pay and, if appropriate, front pay, lost wages, past and future, loss of future earnings and earnings capacity, loss of career opportunities, loss of employee benefits, past and future, severe emotional distress, pain and suffering, embarrassment, humiliation, damage to personal and professional reputation, court costs, expense of litigation, expert witness fees, punitive damages, reasonable attorney's fees for this legal action and defense of her unemployment compensation claim, prejudgment interest, as well as any other further legal and equitable relief this Court deems just and appropriate under the ADA.

### COUNT IV – PHRA – EMPLOYMENT DISCRIMINATION AND RETALIATION

58.	The previous paragraphs are incorporated.

59.	The PHRA and ADA are interpreted in a co-extensive manner. Fogleman v. Mercy Hosp., 283 F.3d 561, 567 (3d Cir. 2002); Canteen Corp., Div. of Compass Group v. Pa. Human Rels. Comm'n, 814 A.2d 805, n.5 (Pa. Commw. Ct. 2003).

60.	Ms. Saxton's claims alleged under the ADA are alleged similarly under the PHRA.

61. As a result of Redstone's unlawful actions, Ms. Saxton suffered damages which include, but are not limited to, loss of back and front pay, loss of earnings potential, loss of career opportunities, loss of future earnings, lost benefits past and future, damage to her personal and professional reputation, emotional distress, humiliation, embarrassment, inconvenience, and loss of life's pleasures.

**WHEREFORE,** Ms. Saxton respectfully requests judgment against Redstone in an amount that will compensate her for her injuries and damages resulting from Redstone's violation of her rights under the PHRA, and award her reinstatement, back pay and, if appropriate, front pay, lost wages, past and future, loss of future earnings and earnings capacity, loss of career opportunities, loss of employee benefits, past and future, severe emotional distress, pain and suffering, embarrassment, humiliation, damage to personal and professional reputation, court costs, expense of litigation, expert witness fees, reasonable attorney's fees for this legal action and defense of her unemployment compensation claim, prejudgment interest, as well as any other further legal and equitable relief this Court deems just and appropriate under the PHRA.

## **COUNT V – COMMON LAW WRONGFUL DISCHARGE**

62. The previous paragraphs are incorporated.

63. Notwithstanding that Ms. Saxton is an employee-at-will, Pennsylvania common law recognizes a wrongful discharge claim for retaliation because of a workers' compensation claim. <u>Owens v. Lehigh Valley Hosp.</u>, 103 A.3d 859 (Pa. Commw. Ct. 2014).

64. Redstone's resentment of Ms. Saxton's workers' compensation claim was a substantial contributing factor to her discharge.

65. As a result of Redstone's wrongful discharge of Ms. Saxton because she filed a workers' compensation claim, she suffered damages which include, but are not limited to, loss of back and front pay, loss of earnings potential, loss of career opportunities, loss of future earnings, lost benefits past and future, damage to her personal and professional reputation, emotional distress, humiliation, embarrassment, inconvenience, and loss of life's pleasures.

66. Redstone's actions were intentional, willful, wanton and outrageous which justify an award of punitive damages.

**WHEREFORE,** Ms. Saxton respectfully requests judgment against Redstone in an amount that will compensate her for her injuries and damages resulting from Redstone's wrongful discharge, and award her compensatory, non-compensatory, and punitive damages, plus court costs and prejudgment interest.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Ms. Saxton demands a trial by jury in this action for all issues so triable.

                                          Respectfully submitted,

                                          TREMBA, KINNEY, GREINER & KERR, LLC

Date:    7/13/2018            By:    /s/ Lawrence D. Kerr, Esq.
                                          Lawrence D. Kerr, Esq.
                                          PA I.D. #58635

                                          /s/ Claire E. Throckmorton, Esq.
                                          Claire E. Throckmorton, Esq.
                                          PA I.D. #321125
                                          Attorneys for Plaintiff
                                          302 West Otterman Street
                                          Greensburg, PA 15601